FILED: March 1, 2013

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 11-5095
(1:09-cr-00297-JFM-1)

UNITED STATES OF AMERICA

    Plaintiff - Appellee

v.

TYRONE MOORE

    Defendant - Appellant

JUDGMENT

In accordance with the decision of this court, the judgment of the district court is vacated. This case is remanded to the district court for further proceedings consistent with the court's decision.

This judgment shall take effect upon issuance of this court's mandate in accordance with Fed. R. App. P. 41.

                              /s/ PATRICIA S. CONNOR, CLERK

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*
v.
TYRONE MOORE,
    *Defendant-Appellant.*

No. 11-5095

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Senior District Judge.
(1:09-cr-00297-JFM-1)

Argued: December 7, 2012

Decided: March 1, 2013

Before TRAXLER, Chief Judge, and GREGORY and
DAVIS, Circuit Judges.

Vacated and remanded by published opinion. Chief Judge Traxler wrote the opinion, in which Judge Gregory and Judge Davis joined.

**COUNSEL**

**ARGUED:** James Michael Nichols, WARNKEN, LLC, Towson, Maryland, for Appellant. Jefferson McClure Gray, OFFICE OF THE UNITED STATES ATTORNEY, Balti-

more, Maryland, for Appellee. **ON BRIEF:** Byron L. Warnken, WARNKEN, LLC, Towson, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Christopher J. Romano, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

## OPINION

TRAXLER, Chief Judge:

A jury convicted Tyrone Moore of carjacking, using a firearm in furtherance of carjacking, and conspiracy. After the trial, Moore filed a motion for a new trial based, in part, on newly discovered evidence, but the district court denied it. Because the district court erred in denying Moore's motion for a new trial, we vacate and remand for a new trial consistent with this opinion.

### I.

#### A.

In the early evening of November 25, 2007, Donald Roarty parked his Jeep Grand Cherokee on East 39th Street in Baltimore, Maryland to attend a meeting at a nearby church. When he exited his vehicle and began walking toward the church, he heard a voice behind him asking where he could find a "whatchamacallit." When Roarty turned around, a man who was standing approximately five feet away pulled out a handgun and demanded the keys to Roarty's Jeep. Roarty complied by tossing the keys to the assailant, who subsequently drove off in the Jeep. Roarty then called the police to report the crime. The encounter lasted only twenty to thirty seconds. Because the assailant was wearing a hat and had a dark bandana over his face, Roarty could only see his eyes and dreadlocks showing below the hat.

Three days later, on November 28, 2007, Detective Brandon Underhill of the Harford County Sheriff's Office, who was working in an undercover capacity at the time, met with Larry Pollin to conduct an undercover drug buy. Pollin arrived at the meeting place in a Jeep Grand Cherokee with three other people, and he and Detective Underhill exchanged money for crack cocaine. Detective Underhill could not determine who drove the vehicle to the drug buy, but he testified that Pollin drove the vehicle away. A surveillance unit of the sheriff's office working alongside Detective Underhill ran the plates and determined that the Jeep was registered to Donald Roarty. At the time, however, the sheriff's office was unaware that Roarty had reported the Jeep stolen. Therefore, after following the Jeep for 45 minutes to conduct surveillance after the drug sale, the sheriff's office terminated the encounter. The detectives involved in the drug buy were unable to identify the other three individuals in the vehicle.[1]

Four days later, on December 2, 2007, Deputy Jeffrey Gerres of the Harford County Sheriff's Office was patrolling an apartment complex known for drug and gang activity. Gerres noticed several men standing in a breezeway below a sign that proscribed loitering and recognized one of the men as Lamere Walton, a known gang member. Deputy Gerres parked outside of the development and approached the men on foot to investigate. As Deputy Gerres approached, some of the men ran into nearby apartments. However, Deputy Gerres was able to stop and detain Walton, who immediately began reaching in his pockets. Fearing that Walton was attempting to get a weapon or seeking to destroy evidence, Deputy Gerres pulled Walton's hand out of his pocket. In Walton's hand was a car key.

---

[1] Pollin was subsequently arrested, taken into custody, and indicted for his participation in a gang-related shooting. It is unclear from the record whether Pollin or the other three individuals were ever indicted for their role in selling crack cocaine.

Deputy Gerres pressed the key's panic button, which activated the lights and horn of a Jeep parked nearby. After running the plates on the vehicle, Deputy Gerres learned that the vehicle had been recently stolen in an armed carjacking. The vehicle turned out to be Roarty's stolen Jeep, and Walton was placed under arrest. Deputy Gerres then searched the vehicle with the aid of other officers and found a black and orange Baltimore Orioles baseball cap. During this encounter, Tyrone Moore, whom Deputy Gerres knew to be a gang member and an associate of Walton's, walked by the scene wearing a black Orioles t-shirt, black and orange pants, and black and orange shoes. Because Moore and Walton were friends and because Moore's outfit matched the baseball cap within the vehicle, Deputy Gerres detained Moore for a brief investigation. Moore denied involvement in the carjacking, and Deputy Gerres took photographs of Moore to show his clothing and then released him.

Subsequently, the Baltimore City Police Department began efforts to create a photo line-up for use in the Roarty case. The police department contacted Corporal Richard E. Carroll, III, of the Maryland State Police Department, and requested a photograph of Moore to use in the photo array. Corporal Carroll indicated that not only did he have a photo of Moore, but he also possessed a photo array, already prepared for an unrelated investigation in October 2007, that included Moore's photograph. Corporal Carroll provided that photo array to the city police officers who decided to use it in their investigation.

Roarty was then contacted by the city police department and asked to come to the station to view the photo array. The police department told Roarty that they had recovered his Jeep and that they had a suspect in custody. Although the police department did not tell Roarty that the suspect was in the photo array, Roarty testified that he assumed the suspect would be in it based on the fact that a suspect was in custody at the time. When looking at the photos, Roarty initially indi-

cated that he was not sure he would be able to make an identification in light of the fact that so much of the assailant's face had been covered up at the time of the carjacking. One of the officers administering the photo array instructed Roarty to focus on the portion of the face that Roarty could see at the time of the carjacking—the eyes. Based on the eyes and general shape of the face in a particular photograph, Roarty picked Moore out of the photo array, indicating at the time that he was 95% certain that the person he selected was the carjacker.

B.

Moore was indicted for conspiracy to steal a car with intent to cause serious bodily harm, see 18 U.S.C. § 371 ("Count 1"); theft of a car with intent to cause serious bodily harm, see 18 U.S.C. § 2119 ("Count 2"); and use of a firearm in furtherance of carjacking, see 18 U.S.C. § 924(c) ("Count 3"). Prior to trial, Moore requested that the government provide photographs of Pollin taken at or near the time the carjacking occurred. The government complied by providing Moore with several pictures of Pollin, including one depicting Pollin with dreadlocks ("Dreadlocks Picture") and one depicting Pollin with short hair ("Short Hair Picture"). The government explained to Moore's attorney that some of the pictures came from a police incident report relating to Pollin's arrest for a shooting that occurred approximately one month after the carjacking. The Short Hair Picture was dated December 31, 2007. Notably, the Dreadlocks Picture was undated.

The focus of the trial that followed was the identity of the carjacker. Seeking to persuade the jury that Moore was the carjacker, the government made efforts to eliminate the possibility that someone other than Moore committed the crime. Because Pollin was the first person seen driving the stolen Jeep, only three days after the carjacking, part of the government's case was excluding Pollin as the possible assailant.

The government sought to achieve this end in large part by offering proof that Pollin did not have dreadlocks at the time of the carjacking. To establish this fact, the government produced the testimony of the officer who saw and dealt with Pollin shortly after the Roarty incident and corroborated his testimony with a photograph taken of Pollin a month later. Specifically, Detective Underhill testified that he saw Pollin on November 28, 2007, three days after Roarty was robbed and that Pollin had short hair at that time. Detective Underhill then viewed the Short Hair Picture of Pollin, represented by the government to have been taken by law enforcement on December 31, 2007, and confirmed that Pollin's short hair in that photograph was similar to his short hair length that Detective Underhill saw on November 28. Detective Underhill further testified that he could not recall Pollin ever having dreadlocks. When counsel for Moore asked Detective Underhill about the Dreadlocks Picture on cross-examination, Detective Underhill explained that "[t]he hair [was] different from what [he] kn[e]w." J.A. 341.

As previously stated, the government also provided Moore with a picture of Pollin with dreadlocks, but it was undated. In attempting to prove that Pollin had dreadlocks at the time of Roarty's carjacking, Moore's counsel asked defense witness Michael Wells about the Dreadlocks Picture. Wells was a friend of Moore's and a cousin of Pollin's, and was incarcerated at the time of Moore's trial for drug and firearm offenses. So although Wells did testify that Pollin had dreadlocks at the time of the carjacking, his testimony was weak in the face of the government's dated photograph and corroborating testimony from Detective Underhill. Ultimately, the jury believed that Moore was the assailant and that Pollin was not, and it convicted Moore of each count in the indictment.[2]

---

[2]To be certain, establishing that Pollin was or was not the carjacker was not the only issue at trial. However, as is evident by the fact that both the government and Moore raised the issue of Pollin's hair length in their closing arguments, it was a central issue at the trial.

C.

After trial, Moore continued to insist to his attorney that the Short Hair Picture, despite the fact that it was dated December 31, 2007, was not consistent with his recollection of Pollin's appearance at that time. Counsel for Moore contacted counsel for the government and asked him to confirm the date of the Short Hair Picture. The government continued to represent that the picture was taken on December 31, 2007, and it belittled the defendant for continuing to raise a question about the date the photo was taken. Specifically, the government responded to Moore's counsel with the following: "To the extent that your client claims to have seen [Pollin] . . . in December with dre[a]ds, he is either mistaken or lying. Care to guess which it is?" J.A. 785. As it turns out, the government was the one mistaken. Pollin did indeed have dreadlocks in November and December 2007, and the date on the Short Hair Picture was wrong.

Moore's attorney ultimately proved this by raising the issue with Pollin's former attorney, who happened to have in his file Pollin's real booking photograph taken on December 31, 2007, that depicted Pollin with dreadlocks. This photo matched the undated Dreadlocks Picture. The government has now admitted that the Short Hair Picture it received from Harford County, produced to Moore, used and relied upon at trial, and represented to have been taken on December 31, 2007, was, unbeknownst to it at the time of trial, not taken until early 2009 when Pollin first cut off his dreadlocks.

This discrepancy resulted from a system utilized by Harford County up until Spring 2009, in which booking photographs were replaced automatically by new photographs whenever an inmate changed his or her appearance dramatically. According to Corporal Christopher Crespo, a booking supervisor with the Harford County Sheriff's Office, under this system, an inmate's original booking photograph would always be retained in a hard-copy file but the electronic copy

of the original booking photograph would be replaced by any new photographs that were taken to depict an inmate's then-current appearance. And as is evident from the facts of this case, the new electronic photograph would apparently retain the date of the inmate's initial booking, as if the new picture were taken when the inmate was initially processed and brought into the detention facility.[3] Corporal Crespo further stated that the Short Hair Picture was taken in January 2009 and that his review of the complete record of photographs revealed that Pollin had dreadlocks until January 2009.

There is no doubt that Harford County could have done more to ensure that it provided the United States Attorney's Office with an accurate booking photograph of Pollin. However, there is no evidence to suggest that the Assistant United States Attorney prosecuting this case produced and used the Short Hair Picture with anything but an honest belief in its accuracy. That being said, Moore suffered the consequences of having a jury believe that Pollin, the first person seen in the Jeep three days after the carjacking, looked nothing like the assailant described by Roarty at the time of the carjacking.

For this reason, Moore filed a motion for a new trial with the district court. In his motion, Moore argued that the discovery of the actual dates of the Short Hair Picture and the Dreadlocks Picture constituted newly discovered evidence and, alternatively, that the government's failure to disclose this fact violated *Brady v. Maryland*, 373 U.S. 83 (1963). The district court denied the motion, and Moore appeals from that ruling. Because we find that the district court erred in rejecting Moore's newly-discovered-evidence argument, we conclude that Moore is entitled to a new trial.

---

[3]Because Harford County, and subsequently the government at trial, produced the Short Hair Picture, we assume that the Short Hair Picture came from Harford County's electronic file.

## II.

To be entitled to a new trial under Federal Rule of Criminal Procedure 33 based on newly discovered evidence, a defendant must satisfy a five-part test by showing that (1) the evidence is newly discovered; (2) the defendant exercised due diligence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence would probably result in acquittal at a new trial. *See United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989) ("*Chavis* Test"). We review the denial of a motion for a new trial for an abuse of discretion. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003).

The district court concluded that Moore satisfied the first three prongs of the *Chavis* Test because the actual booking photograph of Pollin taken on December 31, 2007, depicting him with dreadlocks was newly discovered evidence; Moore exercised due diligence in discovering the evidence; and the new evidence was not merely cumulative or impeaching. However, the district court concluded that Moore could not satisfy the materiality prong of the *Chavis* Test because he put on a defense at trial that the court found to be disingenuous. Specifically, the court concluded that

> Moore chose to put on a defense that he could not have committed the carjacking because he was present at a violent incident that occurred at another location when the carjacking occurred. Although a photograph suggesting that Pollin, not Moore, might have committed the carjacking was tangentially relevant to the defense, the fact of the matter is that the defense was entirely unconvincing, as was Moore's contention, based upon false testimony that he produced, that it was a junkie who committed the carjacking. . . . Because he chose to present a defense based on perjured testimony, I will not permit him to have another opportunity to obtain an acquittal

> because of the innocent error that was made by the production of an erroneous photograph to him.

J.A. 798-99. And with regard to the fifth prong of the *Chavis* Test concerning the probability of success on retrial, the district court stated that it did not need to reach that issue given its conclusion that the evidence was not material. Nonetheless, the court also stated that "[i]f Moore had not made the decision to present this fabricated defense, I would grant him the new trial he requests." J.A. 799.

On appeal, Moore contends that the district court correctly resolved the first three *Chavis* factors in his favor, that the district court abused its discretion in evaluating the materiality prong, and that he can satisfy the fifth *Chavis* factor by showing that it is likely that he would be acquitted at a new trial. The government, however, contends that Moore cannot satisfy any of the *Chavis* factors. *See United States v. McHan*, 386 F.3d 620, 623 (4th Cir. 2004) (observing that we are "entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court" (internal quotation marks omitted)).

In our view, the district court did not abuse its discretion in resolving the first prong of the *Chavis* Test in favor of Moore. "[N]ewly discovered evidence means evidence discovered since the trial," *United States v. Fulcher*, 250 F.3d 244, 250 (4th Cir. 2001) (internal quotation marks omitted), and the discovery of the actual dates of the Dreadlocks Picture—Pollin's actual booking photograph—and the Short Hair Picture were discovered by Moore's counsel after the trial. The district court also did not abuse its discretion in concluding that Moore exercised due diligence. First, as a general matter, Moore made reasonable efforts before and during trial to establish that Pollin had dreadlocks at the time of the carjacking. These efforts included making pre-trial requests of the government for accurate photographs of Pollin, seeking surveillance photographs of Pollin taken during an unrelated

...

UNITED STATES v. MOORE                    11

narcotics investigation, questioning a friend of Pollin's about Pollin's hairstyle, and cross-examining Detective Underhill about his recollection of Pollin's hair. With regard to the specific photo of Pollin taken on December 31, 2007, what must be remembered is that the government not only represented to Moore's lawyer (and the jury) that the photo was taken on the date inscribed on the picture, but the date was confirmed and bolstered by the testimony of the government's witness Detective Underhill. While there may be times when due diligence requires an attorney not to accept at face value a representation made by the government, here the photo evidence was created by law enforcement and could reasonably be presumed to be within the exclusive control of law enforcement and hence the government, and the date stamp on the photo reasonably presumed to be accurate. We cannot fault Moore's attorney for not pursuing the validity of the government's representation further than he did. Although Moore did not seek out Pollin's attorney until after trial, we do not think that the district court abused its discretion in finding that Moore satisfied the due diligence prong under these circumstances. And finally, the district court did not abuse its discretion in concluding that the newly discovered evidence was not merely cumulative or impeaching.

With regard to the fourth prong of the *Chavis* Test, however, we believe the district court erred in concluding that the newly discovered evidence was not material. A defendant satisfies the materiality prong by showing that the evidence was "material to the issues involved." *United States v. Robinson*, 627 F.3d 941, 948 (4th Cir. 2010) (internal quotation marks omitted). In evaluating the materiality prong, the district court concluded that the newly discovered evidence was "tangentially relevant" to Moore's contention that Pollin was the carjacker. J.A. 799. But the court nonetheless found that Moore could not establish materiality because Moore put on two defenses that the court found to be disingenuous. It is true that part of Moore's defense was establishing that he was present at a violent altercation at another location at the time of the

carjacking and that a "junkie" committed the carjacking. However, Moore's defense also included pointing the finger at Pollin as the more likely assailant, a defense that was not only addressed during trial but was also raised during Moore's closing argument. At bottom, this case was about the identity of the carjacker, a very close issue given the small amount of the assailant's face Roarty could see during the incident. Accordingly, evidence bearing on the identification of the carjacker was undoubtedly material to the issues involved in this case. *See United States v. Piazza*, 647 F.3d 559, 569 (5th Cir. 2011) (agreeing with district court for proposition that "evidence is certainly material as it goes to whether another person committed the acts of which the jury found [the defendant] guilty" (internal quotation marks omitted)). A conclusion to the contrary in the context of this case was error in our view.

Because the district court found that Moore could not satisfy the fourth *Chavis* factor, it did not rule definitively on the fifth and final factor—whether the newly discovered evidence would probably result in acquittal at a new trial. Having reviewed the parties' briefs and the record below, having had the benefit of oral argument, and given the importance of the evidence, we find that Moore can satisfy the fifth factor. Accordingly, Moore is entitled to a new trial.[4]

### III.

Moore also challenges the admission under Federal Rule of Evidence 404(b) of evidence of his prior possession of certain firearms. Because this issue is likely to recur on retrial, we exercise our discretion to address the issue in this appeal. *See United States v. Ebersole*, 411 F.3d 517, 535 (4th Cir. 2005); *see also Elm Grove Coal Co. v. Dir., O.W.C.P.*, 480 F.3d 278,

---

[4] Given our disposition of the newly-discovered-evidence issue, we need not address Moore's *Brady* claim.

UNITED STATES v. MOORE                    13

299 n.20 (4th Cir. 2007) ("We choose to address this discovery issue because it is likely to arise on remand.").

A.

At trial, the district court permitted the government to introduce evidence showing that Moore possessed a firearm on at least three prior occasions: Mia Franklin testified that she had previously seen Moore possessing a "revolver," J.A. 316, and the government introduced a photograph of a semi-automatic pistol belonging to Moore that was found in the apartment of Moore's girlfriend and another photograph showing Moore holding a semi-automatic pistol.[5]

As Moore argues, revolvers and semi-automatic pistols are not the same thing. "[A] revolver is a type of handgun having a revolving cylinder containing chambers for cartridges. The gun is fired by squeezing the trigger or cocking the hammer, whereupon the cylinder rotates clockwise and aligns a chamber with the barrel." *United States v. Precise Import Corp.*, 458 F.2d 1376, 1378 (C.C.P.A. 1972). A semi-automatic pistol, on the other hand, does not have a rotating cylinder. Instead, it has a removable magazine in its handle which "utiliz[es] the energy of recoil to feed cartridges from a magazine to the chamber in the barrel." *Id.* at 1379. The firearm used in the carjacking was a revolver, not a semi-automatic pistol.

B.

Rule 404(b) prohibits evidence of other crimes or bad acts committed by the defendant if offered "solely to prove a defendant's bad character, but such evidence may be admissible for other purposes, such as proof of motive, opportunity,

---

[5]Officer James Evans of the Aberdeen Police Department identified the firearms in these photographs as semi-automatic pistols. Neither party disputes that description.

intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *United States v. Byers*, 649 F.3d 197, 206 (4th Cir. 2011) (internal quotation marks and alterations omitted). "Rule 404(b) is a rule of inclusion, admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *Id.* (internal quotation marks omitted).

Moore's Rule 404(b) argument focuses primarily on the district court's decision to admit the semi-automatic-pistol evidence. However, to the extent that Moore also contends that Franklin's testimony about his possession of a revolver violated Rule 404(b), we find no abuse of discretion by the district court. *See id.*

Moore's possession of a revolver—the same type of gun used in the carjacking—was directly relevant and necessary to proving his guilt. *See id.* at 208 (evidence is relevant for Rule 404(b) purposes if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" (internal quotation marks omitted)); *id.* at 209 ("Evidence is necessary where it is an essential part of the crimes on trial, or where it furnishes part of the context of the crime." (internal quotation marks omitted)). Therefore, we cannot say that the district court "acted arbitrarily or irrationally in admitting [this] evidence." *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008) (internal quotation marks omitted); *see Byers*, 649 F.3d at 206 (decision to admit Rule 404(b) evidence is not an abuse of discretion unless the decision was "arbitrary and irrational" (internal quotation marks omitted)).

The admission of the semi-automatic-pistol evidence, however, presents a different issue. *See United States v. Miller*, 673 F.3d 688, 695 (7th Cir. 2012) ("If the prior possession was of a different gun, then its value as direct or circumstan-

tial evidence . . . drops and the likelihood that it is being used to show propensity to possess guns rises considerably.").

As noted above, evidence of prior bad acts is generally admissible except when the evidence is used "to prove a person's character in order to show that . . . the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). The rule carves out this propensity character evidence from what is otherwise "a rule of inclusion" because "evidence of a person's character supplies an inadequate causal link between it and the specific conduct sought to be established." *United States v. Queen*, 132 F.3d 991, 994, 995 (4th Cir. 1997). The district court accepted the government's theory and admitted the semi-automatic-pistol evidence to demonstrate that Moore had the "opportunity" to possess and to access firearms. *See* Fed. R. Evid. 404(b)(2). We find that the district court's decision to admit this evidence for this reason was error.

At trial, Moore never contested the fact that he had previously possessed a firearm. Moreover, Franklin's testimony that she had previously seen Moore in possession of a revolver established Moore's access to the type of firearm that was used in the carjacking. The evidence of Moore's possession of a different type of firearm, introduced via Rule 404(b), served only to establish Moore's criminal disposition and was therefore inadmissible. *See United States v. Hawkins*, 589 F.3d 694, 705 (4th Cir. 2009) (explaining that evidence of defendant's prior possession of a firearm would not be admissible under Rule 404(b) at a separate trial on charges that defendant brandished a *different* firearm during a carjacking: "There [is] simply nothing about [the defendant's] being in possession of a different firearm . . . that [is] related to any of the elements of the carjacking counts."). Accordingly, we find that the district court erred in finding the evidence admissible under Rule 404(b)(2).

In reaching this conclusion, however, we do not foreclose the possibility that the district court on retrial may find the

semi-automatic-pistol evidence admissible under a different rule, *see, e.g., United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997) ("[T]his Court's holding that the evidence was inadmissible under Rule 404 at the first trial does not foreclose consideration of admissibility under a different rule of evidence on retrial."), or that the evidence at retrial may differ significantly enough to warrant reconsideration of its admissibility under Rule 404(b), *see Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (law-of-the-case doctrine does not preclude reconsideration of issue resolved by appellate court if "subsequent trial produces substantially different evidence" (internal quotation marks omitted)). Nonetheless, in the context of the evidence presented in the trial that we have reviewed, the district court abused its discretion by admitting the semi-automatic-pistol evidence under Rule 404(b).[6]

IV.

For the foregoing reasons, we vacate Moore's conviction and remand for a new trial in accordance with this opinion.

*VACATED AND REMANDED*

---

[6]Moore also challenges Roarty's out-of-court identification prior to trial and the district court's factfinding at sentencing. Having reviewed the parties' arguments, we find no error with regard to these two claims.

FILED: March 1, 2013

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 11-5095,  US v. Tyrone Moore
1:09-cr-00297-JFM-1

### NOTICE OF JUDGMENT

Judgment was entered on this date in accordance with Fed. R. App. P. 36. Please be advised of the following time periods:

**PETITION FOR WRIT OF CERTIORARI:** To be timely, a petition for certiorari must be filed in the United States Supreme Court within 90 days of this court's entry of judgment. The time does not run from issuance of the mandate. If a petition for panel or en banc rehearing is timely filed, the time runs from denial of that petition. Review on writ of certiorari is not a matter of right, but of judicial discretion, and will be granted only for compelling reasons. (www.supremecourtus.gov)

**VOUCHERS FOR PAYMENT OF APPOINTED OR ASSIGNED COUNSEL:** Vouchers are sent to counsel appointed or assigned by the court in a separate transmission at the time judgment is entered. CJA 30 vouchers are sent to counsel in capital cases. CJA 20 vouchers are sent to counsel in criminal, post-judgment, habeas, and § 2255 cases. Assigned counsel vouchers are sent to counsel in civil, civil rights, and agency cases. Vouchers should be completed and returned within 60 days of the later of entry of judgment, denial of a petition for rehearing, or the grant or denial of a petition for writ of certiorari. If counsel appointed or assigned by the court did not receive a voucher, forms and instructions are available from the court's web site, www.ca4.uscourts.gov, or from the clerk's office.

**BILL OF COSTS:** A party to whom costs are allowable, who desires taxation of costs, shall file a Bill of Costs within 14 calendar days of entry of judgment. (FRAP 39, Loc. R. 39(b)).

**PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC:** A petition for rehearing must be filed within 14 calendar days after entry of judgment, except that in civil cases in which the United States or its officer or agency is a party, the petition must be filed within 45 days after entry of judgment. A petition for rehearing en banc must be filed within the same time limits and in the same document as the petition for rehearing and must be clearly identified in the title. The only grounds for an extension of time to file a petition for rehearing are the death or serious illness of counsel or a family member (or of a party or family member in pro se cases) or an extraordinary circumstance wholly beyond the control of counsel or a party proceeding without counsel.

Each case number to which the petition applies must be listed on the petition to identify the cases to which the petition applies and to avoid companion cases proceeding to mandate during the pendency of a petition for rehearing in the lead case. A timely filed petition for rehearing or petition for rehearing en banc stays the mandate and tolls the running of time for filing a petition for writ of certiorari.

A petition for rehearing must contain an introduction stating that, in counsel's judgment, one or more of the following situations exist: (1) a material factual or legal matter was overlooked; (2) a change in the law occurred after submission of the case and was overlooked; (3) the opinion conflicts with a decision of the U.S. Supreme Court, this court, or another court of appeals, and the conflict was not addressed; or (4) the case involves one or more questions of exceptional importance. A petition for rehearing, with or without a petition for rehearing en banc, may not exceed 15 pages. Copies are not required unless requested by the court. (FRAP 35 & 40, Loc. R. 40(c)).

**MANDATE:** In original proceedings before this court, there is no mandate. Unless the court shortens or extends the time, in all other cases, the mandate issues 7 days after the expiration of the time for filing a petition for rehearing. A timely petition for rehearing, petition for rehearing en banc, or motion to stay the mandate will stay issuance of the mandate. If the petition or motion is denied, the mandate will issue 7 days later. A motion to stay the mandate will ordinarily be denied, unless the motion presents a substantial question or otherwise sets forth good or probable cause for a stay. (FRAP 41, Loc. R. 41).